1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CALIFORNIA RIVER WATCH,                    No.  2:17-cv-00524-KJM-KJN

12                  Plaintiff,

13         v.                                   ORDER

14   CITY OF VACAVILLE,

15                  Defendant.

16

17         In this case in which plaintiff California River Watch ("plaintiff" or "River

18   Watch") alleges toxic contamination under the Resource Conservation and Recovery Act

19   ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), each party moves for summary judgment on the sole

20   remaining claim related to the presence of hexavalent chromium in the public water supply as

21   endangering human health.[1]  Plaintiff also moves to exclude portions of the expert witness report

22   offered by defendant City of Vacaville ("defendant" or "Vacaville") and also moves to strike the

23   declaration of Adam Love in support of Vacaville's summary judgment motion.  Vacaville

24   _____

25         [1] The complaint originally set forth a single claim under the RCRA with two component
     parts: one for endangerment to human health and one for endangerment to the environment.  *See*
26   Compl.   ¶¶ 27–32, ECF No. 1.  On February 10, 2020, the court approved the parties' stipulation
     dismissing the environmental endangerment component of plaintiff's RCRA claim.  *See* ECF No.
27   78.  Therefore, the sole remaining issue in this case relates to alleged endangerment to the health
     of the City of Vacaville's customers through exposure to the City's potable water system.
28
                                              1

1   separately moves to strike proposed corrections made in the deposition errata submitted by

2   Dr. Larry Russell, plaintiff's expert witness.

3           On April 10, 2019, the court heard oral argument on the motions.  Counsel Jack

4   Silver and David Weinsoff appeared for plaintiff; counsel Gregory Newmark appeared for

5   defendant.  Having considered the motions and all evidence in support thereof, and for the

6   reasons explained below, the court GRANTS in part and DENIES in part defendant's motion for

7   summary judgment.  Plaintiff's motion for summary judgment is DENIED, and the motion to

8   exclude and motions to strike are DENIED as moot.

9           Ultimately, the court concludes the case should be CLOSED.  While it cannot be

10   disputed that hexavalent chromium itself presents a risk to human health, plaintiff here attempts

11   to stretch the RCRA statute well beyond its application, seeking to force a square peg into a round

12   hole.  As the court explains below, the RCRA cannot bear the interpretation plaintiff advances.

13   I.      BACKGROUND

14           This case turns on a question of statutory interpretation; therefore, the court

15   provides only a brief recitation of the facts and procedural history.  California River Watch, a

16   non-profit organization, brings this citizen's suit under 42 U.S.C. § 6972(a)(1)(B) of the RCRA.

17   Pl.'s Mot. Summ. J. ("MSJ") at 1, ECF No. 40.  River Watch asserts, among other things, that

18   Vacaville is generating and transporting hexavalent chromium through its potable water system

19   and distributing that water to its customers for consumption.  *Id.*  Specifically, River Watch

20   alleges "hexavalent chromium in the CITY's water supply [drawn from its wells and surface

21   water sources] is a waste that is stored, transported or otherwise managed by the CITY from its

22   water treatment plant and facilities."  Compl. ¶ 17, ECF No. 1.  Vacaville's water treatment

23   process, River Watch argues, creates an imminent and substantial endangerment to the health and

24   safety of Vacaville's residents, resulting in a violation under § 6972(a)(1)(B).  Pl.'s MSJ at 1.

25   Most important to plaintiff's claim is whether the product it says Vacaville carries in its water

26   constitutes "solid waste" under the RCRA.  *Id.*  Vacaville challenges plaintiff's allegations on

27   many fronts, chief among them plaintiff's failure to satisfy the statutory definition of "solid

28

1   waste" because, it says, the hexavalent chromium contained within its potable water was and is

2   not "discarded" as required by the statute.  Def.'s MSJ at 1, ECF No. 51.

3       River Watch initiated this action on March 13, 2017, bringing a single claim under

4   § 6972(a)(1)(B) and seeking various forms of injunctive relief.  *See generally* Compl.  Vacaville

5   moved to dismiss the complaint for failure to state a claim and violation of the RCRA's anti-

6   duplication provision.  Def.'s Mot. Dismiss, ECF No. 5.  On September 1, 2017, in denying

7   Vacaville's motion, the court found the complaint states a valid RCRA claim and the anti-

8   duplication provision is inapplicable.  Dismissal Order, ECF No. 20.  The pending summary

9   judgment motions followed, along with Vacaville's motion to exclude and plaintiff's motion to

10  strike.  As the court notes above, in February 2020, plaintiff trimmed its RCRA claim to focus on

11  alleged harm to human health alone.  The court resolves the pending motions here.

12  II.   LEGAL STANDARD

13      A court will grant summary judgment "if . . . there is no genuine dispute as to any

14  material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

15  The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

16  resolved only by a finder of fact because they may reasonably be resolved in favor of either

17  party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

18      The moving party bears the initial burden of showing the district court "that there

19  is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477

20  U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish that

21  there is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*.,

22  475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular parts

23  of materials in the record . . .; or show [ ] that the materials cited do not establish the absence or

24  presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

25  support the fact."  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[The

26  nonmoving party] must do more than simply show that there is some metaphysical doubt as to the

27  material facts").  Also, "[o]nly disputes over facts that might affect the outcome of the suit under

28

1   the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at

2   247–48.

3         In deciding a motion for summary judgment, the court draws all inferences and

4   views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at

5   587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a

6   whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

7   issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv.

8   Co.*, 391 U.S. 253, 289 (1968)). Where a genuine dispute exists, the court draws inferences in

9   plaintiffs' favor. *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014). Parties may object to evidence

10  cited to establish undisputed facts. *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 385–86. A court

11  may consider evidence that would be "admissible at trial." *Fraser v. Goodale*, 342 F.3d 1032,

12  1036 (9th Cir. 2003). But the evidentiary standard for admission at the summary judgment stage

13  is lenient: A court may evaluate evidence in an inadmissible form if the evidentiary objections

14  could be cured at trial. *See Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119–20

15  (E.D. Cal. 2006). In other words, admissibility at trial depends not on the evidence's form, but on

16  its content. *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001) (citing *Celotex Corp.*, 477

17  U.S. at 324). The party seeking admission of evidence "bears the burden of proof of

18  admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002). If the

19  opposing party objects to the proposed evidence, the party seeking admission must direct the

20  district court to "authenticating documents, deposition testimony bearing on attribution, hearsay

21  exceptions and exemptions, or other evidentiary principles under which the evidence in question

22  could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 385–86. However,

23  courts are sometimes "much more lenient" with the affidavits and documents of the party

24  opposing summary judgment. *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

25         The Supreme Court has taken care to note that district courts should act "with

26  caution in granting summary judgment," and have authority to "deny summary judgment in a case

27  where there is reason to believe the better course would be to proceed to a full trial." *Anderson*,

28  477 U.S. at 255. A trial may be necessary "if the judge has doubt as to the wisdom of terminating

4

1    the case before trial." *Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1507

2    (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)).  This may be

3    the case "even in the absence of a factual dispute."  *Rheumatology Diagnostics Lab., Inc v. Aetna,*

4    *Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting Black, 22 F.3d

5    at 572); *accord Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).

6            However, when the trial court is presented with a question of statutory

7    interpretation at summary judgment, resolution of such question, even if dispositive, is

8    appropriate.  *See Singh v. Clinton,* 618 F.3d 1085, 1088 (9th Cir. 2010) ("We review the district

9    court's grant of summary judgment as well as its statutory interpretations de novo."); *Johnson v.*

10   *Land O' Lakes*, *Inc.*, 18 F. Supp. 2d 985, 993 (N.D. Iowa 1998) ("statutory interpretation . . . is

11   primarily a legal question amenable to summary judgment.").

12   III.    <u>DISCUSSION</u>

13          This case turns on the meaning of "solid waste" and asks whether the hexavalent

14   chromium in Vacaville's potable water satisfies the definition of that term as used in the RCRA.

15   Before turning to that question, however, the court addresses the threshold issue of plaintiff's

16   standing to bring this citizens' suit.

17          A.    <u>Standing</u>

18          To obtain Article III standing, a plaintiff must show (1) he is under threat of

19   suffering an injury in fact that is concrete and particularized; (2) the threat must be actual and

20   imminent, not conjectural or hypothetical; (3) it must be fairly traceable to the challenged action

21   of the defendant; and (4) it must be likely that a favorable judicial decision will prevent or redress

22   the injury.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  When an organization

23   brings suit, it must establish that at least one of its members "ha[s] standing to sue in [his] own

24   right." *Ecological Rights Found. v. Pac. Gas & Elec. Co. ("Ecological Rights II")*, 874 F.3d

25   1083, 1092 (9th Cir. 2017) (quoting *Ecological Rights Found. v. Pac. Lumber Co.,* 230 F.3d

26   1141, 1147 (9th Cir. 2000)).

27          Here, in bringing its summary judgment motion, River Watch preemptively asserts

28   standing to sue on behalf of its members.  Pl.'s MSJ at 20–22.  River Watch claims the injuries of

1    its members Eliesa Brown, Larry Hanson and Robert Rawson, as articulated in their respective

2    declarations, satisfy the requirements of Article III standing, and thus satisfy River Watch's

3    ability to initiate this action on its members' behalf.  *Id.*; *see also* Brown Decl., ECF No. 41;

4    Rawson Decl., ECF No. 42; Hanson Decl., ECF No. 43.  Specifically, Ms. Brown states she visits

5    her father nearly every day at his Leisure Town home, located in a Vacaville suburb, spends

6    extensive time in Vacaville, is exposed to and consumes water from Vacaville's water filtration

7    system and experiences "substantial aesthetic and personal health concerns" based on that

8    exposure, because she fears "that no water in Vacaville is safe."  Pl.'s MSJ at 21; Brown Decl.

9    ¶¶ 7, 16, 17.  Mr. Hanson, an avid outdoor enthusiast, also spends extensive time in Vacaville

10   visiting a friend and enjoying Vacaville's many outdoor opportunities, particularly Lagoon Valley

11   Park.  Pl.'s MSJ at 21; Hanson Decl. ¶ 7.  Hanson claims that knowledge of the elevated levels of

12   hexavalent chromium in Vacaville's drinking water keep him and his wife from returning to the

13   area for further recreational enjoyment.  Pl.'s MSJ at 21–22; Hanson Decl. ¶ 7.  Finally, River

14   Watch member Mr. Rawson intends to relocate his elderly mother to Vacaville because of its

15   central location and affordable cost of living; however, knowledge of Vacaville's hexavalent

16   chromium levels prevents him and his family from completing the relocation for fear of adverse

17   health effects that may arise from his mother's exposure to chromium.  Pl.'s MSJ at 22; Rawson

18   Decl. ¶¶ 3–4.

19          Vacaville argues River Watch fails to meet the "injury in fact" threshold because it

20   has not shown any "injury was in fact due to the constituents of drinking water.  Therefore, it

21   says, there is 'no causal connection' between the injury and the conduct complained of."  Def.'s

22   Opp'n to Pl.'s MSJ at 22–23, ECF No. 61.  Vacaville also asserts River Watch fails to show the

23   harm it claims is redressable because River Watch cannot establish a violation under RCRA; thus,

24   the injunctive relief River Watch seeks, the bringing of defendant's water treatment operations

25   into compliance with the RCRA, is unattainable because Vacaville already is in compliance.  *Id.*

26          The court finds River Watch has adequately established standing to bring suit on

27   behalf of its members.  As the court in *Ecological Rights II* explained, "The 'injury in fact'

28   requirement in environmental cases is satisfied if an individual adequately shows that she has an

1   aesthetic or recreational interest in a particular place, or animal, or plant species and that that

2   interest is impaired by a defendant's conduct."  874 F.3d at 1093 (citing *Pac. Lumber Co.,* 230

3   F.3d at 1147).  Additionally, an injury in fact may be prospective or retrospective in nature.  *See,*

4   *e.g., Summers*, 555 U.S. at 493 ("[P]laintiff must show he is under *threat* of suffering 'injury in

5   fact.'" (emphasis added)).  The declarations of Eliesa Brown, Larry Hanson and Robert Rawson,

6   and the alleged effects they say they are experiencing or will experience by their exposure to

7   elevated levels of hexavalent chromium, supply a causal connection between the alleged harmful

8   activity and the harm to plaintiff's members.  *See generally* Pl.'s MSJ (detailing detrimental

9   effects of hexavalent chromium exposure).  Moreover, given the broader statutory minima for

10   citizen suits brought under § 6972(a)(1)(B) (providing for citizen suits "against any person . . .

11   present[ing] an imminent and substantial endangerment to health and the environment"), River

12   Watch need not prove a RCRA violation has actually occurred in order to satisfy standing's

13   redressability requirement, because, for purposes of standing under § 6972(a)(1)(B), it need only

14   show Vacaville "created a substantial probability of increased harm to the environment."  *Maine*

15   *People's All. And Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 285 (1st Cir. 2006).

16   Again, given the allegations in River Watch's summary judgment motion, and its supporting

17   evidence, the court finds, for purposes of standing, the redressability element is satisfied.  River

18   Watch has standing to sue.

19           B.    Applicability of RCRA's Anti-Duplication Provision

20           Vacaville argues that River Watch's claim violates the RCRA's anti-duplication

21   provision.  Def.'s MSJ at 13–16.  As Vacaville notes, the court previously rejected this same

22   argument in its order denying Vacaville's motion to dismiss, *see* Dismissal Order at 3–5; thus,

23   Vacaville effectively asks the court to reconsider its ruling here albeit at a different stage of the

24   proceedings, Def.'s MSJ at 13–14.  The outcome below moots this request.

25           Vacaville's motion for summary judgment is DENIED as to the RCRA's anti-

26   duplication provision.

27

28

1          C.      RCRA Analysis

2                  1.      Nature of River Watch's Claim

3                  In order to properly resolve the parties' competing summary judgment motions, it

4      is important to accurately frame the nature of River Watch's claim.  The complaint alleges

5      "[Vacaville] is transporting hexavalent chromium – a listed hazardous waste under RCRA –

6      through [its] water system" to its residents for consumption.  Compl. ¶ 2.  The complaint further

7      states that the "RCRA specifically includes transporters of hazardous waste within the identified

8      class of actions liable under the statute."  Id.  In light of these allegations, it at first appears River

9      Watch seeks to impose liability because Vacaville is using its water treatment system to carry and

10     dispose of a hazardous substance.  Upon more focused briefing, however, and as clarified at

11     hearing, what River Watch actually claims is that Vacaville is generating a hazardous substance,

12     namely hexavalent chromium, through its potable water pumping, treatment and distribution

13     activities, and then carrying that substance through its distribution channels to its consumers in

14     the form of potable water.  See Pl.'s MSJ at 7 ("Hexavalent Chromium is a Byproduct of

15     Vacaville's Production, Treatment, Transportation and Delivery of its Product - Drinking

16     Water."); Hr'g Tr. at 14:9–14, ECF No. 75 ("[W]hat our claim is, is that the product that they're

17     providing is potable water, which is water that is safe to drink. . . . Hexavalent chromium is just a

18     byproduct of the extraction of that water."); Pl.'s MSJ Reply at 5 ("[T]he hexavalent chromium

19     present in Vacaville's potable water is a 'useless byproduct derived from the commercial product

20     and sale of goods and services.'  The 'goods' are potable water.  The 'services' are the delivery of

21     that water to customers.").  In other words, River Watch is not claiming Vacaville is participating

22     in the hazardous waste disposal and transportation process as, for example, a hazardous waste

23     disposal company would; rather, River Watch claims that in the process of creating potable water,

24     Vacaville is generating high concentrations of hexavalent chromium, which is then incorporated

25     into the potable water and distributed to city residents.  See Hr'g Tr. at 11:16–20 (Court: "The

26     [byproduct] theory based on the process of the city's obtaining and preparing the water for

27     introduction into the potable water system, I mean that's really – that's argument characterizing

28     what the city does, right?" River Watch counsel: "Right").

1    This understanding is crucial to determining what is and is not "discarded

2    material" within the statutory meaning of "solid waste," and whether hexavalent chromium

3    qualifies as such, as relevant here.

4                    2.        Statutory Context

5    Turning to the interpretative task at hand, which requires discerning the meaning

6    of "solid waste," the court first orients itself within the statutory framework, while recognizing

7    that statutory interpretation must begin with the text of the statute itself.  Context is particularly

8    important when considering the RCRA, because, as one court has described them, the "[RCRA]

9    regulations are . . . dense, turgid, and circuitous." *Zands v. Nelson*, 779 F. Supp. 1254, 1261

10   (S.D. Cal. 1991) (internal quotations omitted) (quoting *Untied States v. White*, 766 F. Supp. 873,

11   880 (E.D. Wash. 1991)).  "RCRA is a comprehensive environmental statute that governs the

12   treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516

13   U.S. 479, 483 (1996).  Congress's primary concern "was to establish the framework for a national

14   system to insure the safe management of hazardous waste." *Am. Min. Cong. v. U.S. E.P.A.*, 824

15   F.2d 1177, 1179 (D.C. Cir. 1987) (citing H.R. Rep. No. 1491, 94th Cong., 2d Sess. 3 (1976)).  In

16   doing so, Congress sought "to reduce the amount of waste and unsalvageable materials and to

17   provide for proper and economical solid waste disposal practices."  42 U.S.C. § 6901(a)(4).

18   The RCRA permits a private cause of action, *i.e.*, a citizen's suit, against any

19   person "who has contributed or who is contributing to the past or present handling, storage,

20   treatment, transportation, or disposal of any solid or hazardous waste which may present an

21   imminent and substantial endangerment to health or the environment." *Ecological Rights II*, 874

22   F.3d at 1089 (quoting 42 U.S.C. § 6972(a)(1)(B)).  "Solid wastes are regulated under Subchapter

23   IV §§ 6941–49a; hazardous wastes are subject to the more stringent standards of Subchapter III

24   §§ 6921–39b." *Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305,

25   1313 (2d Cir. 1993).  This distinction is critical because "hazardous wastes are a subset of solid

26   wastes . . .  Accordingly, for a waste to be classified as hazardous, it must first qualify as a solid

27   waste under RCRA." *Id.* (internal quotations and some citations omitted) (citing 42 U.S.C.

28   § 6903(5)).

9

1         Here, Vacaville's primary contention is that River Watch cannot succeed in

2    demonstrating that Vacaville's potable water, and the hexavalent chromium traces the water

3    contains, constitutes a "solid waste" under the RCRA.  *See generally* Def.'s MSJ.  To assess

4    Vacaville's argument the court must first determine the correct meaning of "solid waste"; in so

5    doing, the court follows the interpretive steps set out by the Ninth Circuit in *Ecological Rights*

6    *Found. v. Pac. Gas & Elec. Co. ("Ecological Rights I")*, 713 F.3d 502 (9th Cir. 2013).

7         3.    Analysis

8         As explained in *Ecological Rights I*, there are three elements to a § 6972(a)(1)(B)

9    claim:

10        (1) the defendant has been or is a generator or transporter of solid or
     hazardous waste, or is or has been an operator of a solid or hazardous

11        waste treatment, storage or disposal facility; (2) the defendant has
     "contributed" or "is contributing to" the handling, storage, treatment,

12        transportation, or disposal of solid or hazardous waste; and, (3) the
     solid or hazardous waste in question may present an imminent and

13        substantial endangerment to health or the environment.

14   713 F.3d at 514 (citing 42 U.S.C. § 6972(a)(1)(B)).  Vacaville contends the potable water it

15   serves its customers, and the hexavalent chromium the water contains after pumping, treatment

16   and distribution process, together do not constitute a "solid waste"; therefore, Vacaville argues,

17   River Watch's claim fails as a matter of law.  Def.'s MSJ at 5–13.

18        Addressing the same interpretive question here, the meaning of "solid waste," the

19   court in *Ecological Rights I* began with the text of the statutory definition: "We begin with

20   RCRA's definition of 'solid waste,' which is 'garbage, refuse, sludge from a waste treatment

21   plant, water supply treatment plant, or air pollution control facility and other discarded material

22   . . . resulting from industrial, commercial, mining and agricultural operations, and from

23   community activities . . . .'"  *Id.* at 515 (alteration in original) (citing 42 U.S.C. § 6903(27)).  In

24   the absence of a statutory definition for the term "discarded," the court then defined that term as

25   "cast aside; reject; abandon; give up," referencing a dictionary definition.  *Id.* (citing *Safe Air for*

26   *Everyone v. Meyer,* 373 F.3d 1035, 1041 (9th Cir. 2004) (quoting 1 The New Shorter Oxford

27   English Dictionary 684 (4th ed. 1993)); *see also Am. Min. Cong.*, 824 F.2d at 1184 (defining

28   "discarded" as "disposed of; thrown away or abandoned" (internal quotations and citation

1  omitted)).[2]  If the terms of the statutory definitions are clear on their face, then the court need go

2  no further.  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)

3  ("If the intent of Congress is clear, that is the end of the matter; for the court . . . must give effect

4  to the unambiguously expressed intent of Congress.").  The court considers whether the terms are

5  clear and unambiguous below.

6          a)      Applicability of "Discarded" and "Hazardous Waste" as Subset of
7                  "Solid Waste"

8          Before the court examines the facial applicability of the statutory terms, it briefly

9  addresses two other matters for clarification.  First, in light of the statutes' terms and the parties'

10  arguments, River Watch must show Vacaville, as a generator or transporter, has "discarded" the

11  hexavalent chromium into its potable water to satisfy the statutory definition of "solid waste."[3]

12  Although there are a number of possible categories of "waste" listed in § 6903(27), plaintiff

13  makes no contention the hexavalent chromium in Vacaville's water is anything but "other

14  discarded material."  Indeed, River Watch concedes the material must be discarded to satisfy the

15  definition of solid waste.  *See* Pl.'s MSJ at 17 (arguing hexavalent chromium is a "municipal by-

16  product,"[4] which is a component of the broader definition of "discarded materials"); *id.* at 19

17

18          [2]  River Watch uses the term "disposing" to characterize Vacaville's activity that it says
19  runs afoul of the statute: "Vacaville is disposing of hexavalent chromium into its drinking water
    distribution system and the environment which may present an imminent and substantial
20  endangerment to both."  Pl.'s MSJ at 19.  The RCRA itself defines "disposal" as "the discharge,
    deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste
21  into or on any land or water . . . ."  42 U.S.C. § 6903(3).  While "disposal" may be part of the
    broader RCRA vernacular, the relevant question here is whether Vacaville's water containing
22  traces of hexavalent chromium is "discarded" material such that it can satisfy the statutory
    definition of "solid waste."

23          [3]  Although the court previously concluded hexavalent chromium could satisfy the
    meaning of hazardous waste regardless of whether it has been discarded, *see* Dismissal Order at
24  5–6, upon more focused briefing, considering the broader statutory definition applicable to suits
    brought under 42 U.S.C. § 6972(a)(1)(B) and plaintiff's concession on the matter, the court is
25  persuaded the material at issue must be discarded in order to satisfy the statutory definition of
    solid waste.
26
            [4]  Under 40 C.F.R. § 261.1(c)(3), a "by-product" is defined as "a material that is not one of
27  the primary products of a production process and is not solely or separately produced by the
    production process."
28

                                              11

(citing regulatory definition, "which provides that abandoned materials have been 'disposed of' and thus discarded . . . .  As such, Vacaville is disposing of hexavalent chromium into its drinking water"); Pl.'s Opp'n to Def.'s MSJ at 4, ECF No. 59 ("Hexavalent Chromium Being Transported by Vacaville to its Customers and Discharged to Surface Waters is 'Discarded Material.'"); *see also* Def.'s MSJ Reply at 12, ECF No. 63 ("Apparently, the Parties now agree that a failure to show there is a solid waste is dispositive.").  As relevant here, hexavalent chromium must be discarded into Vacaville's potable water to be considered a solid waste.  *See Ecological Rights I*, 713 F.3d at 515 ("Congress enacted RCRA to 'eliminate[] the last remaining loophole in environmental law' by regulating the 'disposal of discarded materials and hazardous wastes.'" (alterations in original) (citing H.R. Rep. No. 94-1491(I), at 4 (1976)).

Secondly, given plaintiff's reliance on the term "hazardous waste," that term must be clarified as well.  Section 6972(a)(1)(B) refers to "solid *or* hazardous waste," and two separate definitions are provided in § 6903 (subsection (5) defining "hazardous waste" and subsection (27) defining "solid waste").  However, as referenced above, within the broader statutory scheme "hazardous waste is defined as a subset of solid waste"; thus plaintiff must satisfy the definition of solid waste to prevail in its arguments here.  *Connecticut Coastal*, 989 F.2d at 1313; *see also Am. Min. Cong.*, 824 F.2d at 1179 ("Because 'hazardous' waste is defined as a subset of 'solid waste,' . . . the scope of EPA's jurisdiction is limited to those materials that constitute 'solid waste.'").  Plaintiff confirms as much: "To be a hazardous waste under RCRA § [6972](a)(1)(B) the waste must first be a solid waste.  The determination of whether the waste is also a hazardous waste is therefore unnecessary and advisory."  Pl.'s Opp'n to Def.'s MSJ at 2.  For these reasons, the court focuses on the term "solid waste," without dwelling on potentially confusing and ultimately irrelevant differences between solid and hazardous waste.

b)   Statutory Analysis

Turning back to the first step of statutory analysis, asking whether the statute's meaning is plain, the court finds the definition of solid waste is ambiguous with respect to whether Vacaville's drinking water containing traces of hexavalent chromium, collected from surface and well waters and distributed through its potable water system to city residents, satisfies

12

1    the statutory definition of solid waste.  As the court in *Connecticut Coastal* explained, "The

2    statute itself does not further define 'discarded material,' and this creates an ambiguity with

3    respect to the specific issue raised: At what point . . . do the materials become discarded?"  989

4    F.2d at 1314; *see also Ecological Rights I*, 713 F.3d at 515 (finding ambiguity in definition of

5    "solid waste" when considering whether wood preservative escaping utility poles encompassed

6    within statutory definition).  Because a facial ambiguity exists, the court turns to the second step

7    of statutory construction: reviewing the legislative history.  *Ecological Rights I*, 713 F.3d at 515

8    (citing *James v. City of Costa Mesa*, 700 F.3d 394, 399 n.8 (9th Cir. 2012)).

9         "RCRA is a comprehensive environmental statute that empowers EPA to regulate

10   hazardous wastes from cradle to grave."  *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 331

11   (1994).  Specifically, it was "designed to address the waste disposal problem, which was, at base,

12   the high volume of waste being generated and the capacity to dispose of that waste in the

13   traditional manner."  *Ecological Rights I*, 713 F.3d at 515 (internal quotations and citations

14   omitted).  Congress intended that the statute's reach be broad:

15   
16   
17   
18
>        It is not only the waste by-products of the nation's manufacturing
>        processes with which the committee is concerned: *but also the
>        products themselves once they have served their intended purposes
>        and are no longer wanted by the consumer*. For these reasons the
>        term discarded materials is used to identify collectively those
>        substances often referred to as industrial, municipal or post-
>        consumer waste; refuse, trash, garbage and sludge.

19   *Connecticut Coastal*, 989 F.2d at 1314 (emphasis in original) (citing H.R. Rep. No. 1491, 94th

20   Cong., 2d Sess. 2 (1976)).  "The key to whether a manufactured product is a 'solid waste,' then, is

21   whether that product 'has served its intended purpose and is no longer wanted by the consumer.'"

22   *Ecological Rights I*, 713 F.3d at 515 (alterations and citation omitted).  And a determination of

23   whether something is a "solid waste" must be made with an eye to the statute's overarching

24   purpose: "[T]o help States deal with the ever-increasing problem of solid waste *disposal*."  *Am.

25   Min. Cong.*, 824 F.2d at 1185 (emphasis in original).

26         With this understanding, the court turns to the question posed by the pending

27   motions: Does Vacaville's potable water contain traces of hexavalent chromium generated

28   through the production process and distributed to its residents and thus qualify as a "solid waste"

1  under the RCRA? The court finds it is not.  On this question, plaintiff's position can be distilled

2  to the following passage:

3          The unifying factor in all these cases for determining whether or not
        the material in question was discarded, is whether the material was
4        still useful or that its presence in the environment was an expected
        consequence of that use. Since hexavalent chromium in drinking
5        water has no intended use, is not wanted by the consumer, and its
        presence and persistence is not an "expected consequence" of
6        Vacaville's potable water production, it is a "discarded material."

7  Pl.'s Opp'n to Def.'s MSJ at 6 (collecting cases).  As noted above, River Watch attempts to draw

8  a distinction between the hexavalent chromium and the drinking water itself, with the water being

9  the product, and the hexavalent chromium being a "useless byproduct."  *Id.* at 7.  In other words,

10 because hexavalent chromium serves no beneficial use in the potable water itself, the water

11 cannot "give that toxin a safe haven."  *Id.*

12         Vacaville argues River Watch misconstrues the meaning of "byproduct" by

13 attempting to isolate the contaminant from the product itself, a maneuver Vacaville asserts goes

14 beyond the statute's intent.  Def.'s MSJ Reply at 6–12.  Vacaville contends:

15         It is undisputed that the product at issue in this case is the water the
        City delivers to its customers. That water is not a waste, and is not
16       discarded, until after it has served its intended purpose. The intended
        purpose of Vacaville's drinking water is, obviously, drinking. It is
17       not a solid waste subject to RCRA at that time because it is serving
        its intended purpose.
18

19 *Id.* at 9.  Further, Vacaville contests River Watch's claim it is disposing of "hexavalent chromium

20 by placing it into its drinking water distribution system," *see* Pl.'s Opp'n to Def.'s MSJ at 9,

21 stating: "This allegation suggests that the City has vessels of [hexavalent chromium] that it needs

22 to get rid of, and it does so by dumping the [hexavalent chromium] into its drinking water system.

23 Of course, nothing of the sort is happening and River Watch has not proven otherwise."  Def.'s

24 MSJ Reply at 11–12.  The court does not reach this latter argument in light of the resolution

25 below.

26         In theory, there is logic to plaintiff's argument, that a host product cannot or

27 should not provide a safe haven for a discarded contaminant under the RCRA simply because that

28 host product is serving its intended purpose; nonetheless, the RCRA's language, history and

14

1    supporting case law lead the court to conclude the RCRA is not intended to regulate Vacaville's

2    water production process here.  To satisfy the statutory definition of solid waste, the material

3    must be discarded; meaning, there must be a point at which the hazardous or contaminating

4    material is separated from the manufactured product, with no intention the material be reserved or

5    returned for further use.  On this point, a number of cases addressing the question of what

6    constitutes a solid waste provide guidance, although their factual underpinnings are

7    distinguishable.  *See, e.g.*, *Ecological Rights I*, 713 F.3d at 515–18 (holding that point at which

8    wood preservative "leaks, spills, or otherwise escapes" from utility poles to which preservative

9    applied does not convert preservative to "solid waste"); *Connecticut Coastal*, 989 F.2d at 1309–

10   18 (finding lead shot and clay targets discharged by patrons of gun club constitute substantial

11   endangerment under statutory definition of solid waste); *Safe Air for Everyone*, 373 F.3d at 1047

12   (concluding that grass residue remaining after a Kentucky bluegrass harvest is not a "solid waste"

13   under RCRA); *cf. Am. Min. Cong.*, 824 F.2d at 1186 (EPA regulation could not extend to

14   materials intended for reuse in manufacturing process because "materials have not yet become

15   part of the waste disposal problem; rather, *they are destined for beneficial reuse of recycling in a*

16   *continuous process by the generating industry itself*" (emphasis in original)).  As these cases help

17   clarify, to be considered discarded material, and in turn a solid waste, there must be a point at

18   which the contaminant separates from the product itself with no intent for reuse, and remains in a

19   separated state with only harmful effects because stripped of any host for which it at one point

20   served a beneficial purpose.

21          Here, River Watch does not present sufficient argument or evidence to

22   demonstrate how Vacaville's water processing activities can qualify as "discarding" "solid waste"

23   under the statute.  For example, in its reply brief, River Watch asserts, "Vacaville extracts highly

24   contaminated water from a small portion of its water sources and disposes of that water into its

25   drinking water distribution system."  Pl.'s MSJ Reply at 5, ECF No. 62.  In support of this

26   assertion, River Watch cites the expert opinion of Dr. Larry Russell.  *See* Russell Report, ECF

27   No. 27-5.  A review of Dr. Russell's report reveals only conclusory allegations regarding how

28

1   Vacaville actually discharges hexavalent chromium into its potable water system.[5]   For example,

2   Dr. Russell discusses the Wickes Site, located in the town of Elmira proximate to Vacaville's

3   Elmira well-field area, and former home to companies including Pacific Wood Preserving and

4   Wickes Forest Industries, Inc.; he notes the Site is a known source of hexavalent chromium and

5   other groundwater contaminants, and says that Vacaville's pumping activities have caused a

6   greater concentration of groundwater to pull from the east, the direction of the Wickes Site from

7   the pumping stations.  Russell Report at 9.  Similarly, Dr. Russell identifies a number of other

8   sources of hexavalent chromium:  he explains that local industry, including a business named

9   Walker Custom Chrome, as well as a process he describes as in situ oxidative remediation and

10   agricultural activities in the region dating back to the 1800s have all contributed to the elevated

11   levels of hexavalent chromium up to 30 µg/l (micrograms per liter) in the areas from which

12   Vacaville sources its potable water.  *Id.* at 2, 10; *see also* Pl.'s MSJ Reply at 6 ("Hexavalent

13   chromium in Vacaville's water is anthropogenic . . . . mean[ing] originating in human activity.").

14   Even accepting all of Dr. Russell's assertions as true, they fail to establish the point at which

15   Vacaville "discards" the hexavalent chromium contaminant as part of its water production

16   process.  The conclusory allegation that "[h]exavalent chromium [is] discharged by Vacaville into

17   its potable water system" is insufficient to create a dispute of material fact.  Russell Report at 10.

18   River Watch itself argues: "Vacaville pumps water from its wells, disinfects via chlorination,

19   adds fluoride and delivers its product to the taps of homes, businesses, schools, and public venues

20   (customers) through its distribution system."  Pl.'s MSJ at 7.  This argument, with plaintiff's

21   supporting evidence, suggests Vacaville is pumping its potable water from sources that are

22   contaminated prior to any treatment.  This is because, as Dr. Russell's report asserts, these

23   sources contain elevated levels of hexavalent chromium before Vacaville's pumping activities,

24   not as a result of Vacaville's pumping activities.  *Compare Ecological Rights I*, 713 F.3d at 515

25

26          [5] Vacaville objects to the admissibility of Dr. Russell's report in its entirety.  *See* Def.'s
27   Obj. to L. Russell Decl., ECF No. 61-13.  The court need not address every objection, but does
     sustain Vacaville's objections to the extent they challenge the vague or conclusory opinions
28   offered by Dr. Russell.  *See* Fed. R. Evid. 402, 403.

1   (considering point at which "wood preservative [the product at issue] [] leaks, spills, or otherwise

2   escapes from the poles").

3           Here, even if Vacaville's water collection, treatment and distribution process did

4   work to elevate hexavalent chromium concentrations such that the finished drinking water

5   product contained higher levels of the contaminant than when first collected, this still would not

6   implicate the RCRA's fundamental requirement that the contaminant be "discarded."  As

7   Vacaville asserts, the water itself is still being delivered to the intended customers in the

8   product's intended state for use as drinking water.  Def.'s MSJ Reply at 5 ("[W]hen the City

9   delivers its drinking water to its customers, it is still a useful product and would not be considered

10  discarded material.").  Pointing to other laws regulating drinking water, Vacaville represents that

11  its water is subject to and complies with the permitting requirements under the Safe Drinking

12  Water Act ("SDWA"), *see, e.g.,* Hr'g Tr. at 27:19–28:9 ("The city has absolutely maintained

13  compliance with all th[e] requirements [of the SDWA]."); the court does not reach the merits of

14  this argument given its resolution of the anti-duplication issue above.  Vacaville correctly notes

15  the RCRA is not an environmental catch-all designed to regulate all traces of potential

16  contaminants, *id.* at 3–5; rather, it "was designed to 'eliminate the last remaining loophole in

17  environmental law' by regulating the 'disposal of discarded materials and hazardous wastes.'"

18  *Connecticut Costal*, 989 F.2d at 1314 (alterations omitted) (citing H.R. Rep. No. 1491, 94th

19  Cong., 2d Sess. 4 (1976)).

20          River Watch relies on the Third Circuit's holding in *Interfaith Cmty. Org. v.*

21  *Honeywell International, Inc.*, 399 F.3d 248, 259 (3rd Cir. 2005), in which the court observed,

22  "given RCRA's language and purpose, Congress must have intended that 'if an error is to be

23  made in applying the endangerment standard, the error must be made in favor of protecting public

24  health, welfare and the environment.'" (citation omitted).  The factual backdrop of *Interfaith*,

25  however, underscores the type of disposal activities the RCRA is intended to remediate.

26  *Interfaith* addressed nearly a century's worth of waste residue, containing high concentrations of

27  hexavalent chromium, produced by a chrome manufacturing conglomerate and its successors.  *Id.*

28  at 252.  The chrome producers would "pile[] this waste at a tidal wetlands site," which over the

17

1    years resulted in "some 1,500,000 tons of [] waste, 15 to 20 feet deep, on some 34 acres." *Id.*

2    Elevated pH levels at the site prevented the hexavalent chromium from reducing naturally to its

3    less-toxic form and enhanced its ability to leach into surface water and groundwater. *Id.* The

4    ensuing citizen's suit brought under RCRA § 6972(a)(1)(B) sought to affirmatively enjoin the

5    manufacturers to clean up the site by excavating the contamination. *Id.* The court ultimately

6    found that "evidence of contamination of water, river sediments, and the river itself" more than

7    supported an endangerment finding under RCRA. *Id.* at 262.

8            *Interfaith* illustrates the type of process whereby a product, such as chrome, is

9    manufactured, and its harmful derivatives, such as hexavalent chromium, are then discarded or

10   separated in a manner prohibited by the RCRA. Indeed, in that case, there was no question

11   defendant manufacturers were discarding the hazardous material, and the defendants conceded as

12   much. *Id.* ("Honeywell conceded that its Site is discharging into the river and that it is possible

13   for those discharges to be harming aquatic organisms."). *Interfaith* represents the type of

14   discarding activity that generates "solid waste" under the RCRA, and stands in stark contrast to

15   the activity at issue here, in which a municipality's potable water incorporates traces of

16   hexavalent chromium as a result of sourcing and production processes.

17           Finally, plaintiff's argument that hexavalent chromium is a useless byproduct does

18   not hold up because it circumvents the "discarded material" requirement for a solid waste; as

19   plaintiff agrees, this requirement is part of the broader statutory definition applicable in suits

20   brought under § 6972(a)(1)(B). *See id.* at 1316 ("RCRA regulations apply the broader statutory

21   definition of solid waste to imminent hazard suits."); *see also* Pl.'s Opp'n to Def.'s MSJ at 2

22   (under RCRA § [6972](a)(1)(B) the broader statutory definition of RCRA waste applies.").

23   Plaintiff's reliance on the EPA definition of "byproduct," or even the dictionary definition it

24   noted at hearing, *see* Hr'g Tr. at 10:5–12, does not acknowledge the need to show the material at

25   issue has been discarded. *See* Pl.'s Opp'n to Def.'s MSJ at 6 (citing 40 CFR 261.1(c)(3)). As

26   Vacaville argued persuasively at hearing, were the court to accept River Watch's "byproduct"

27   theory, doing so would effect an "extreme expansion" of the RCRA by bringing a vast swath of

28   products under its reach when post-production contaminants are present. *See* Hr'g Tr. at 29:14–

1    23 (arguing plaintiff's theory could theoretically bring a package of Romaine lettuce

2    contaminated with E. coli within RCRA's reach).

3            In reaching this conclusion, the court clarifies it is not concluding hexavalent

4    chromium itself poses no threat to Vacaville citizens.  *See Interfaith*, 399 F.3d at 252

5    ("[H]exavalent chromium is highly soluble, a known carcinogen to humans, and toxic to the

6    environment.").  Rather, the court's findings are based solely on the manner and process by which

7    hexavalent chromium ends up in Vacaville's potable water.  Having considered the RCRA's

8    definition of "solid waste," the legislative history motivating its passage and the applicable case

9    law, the court finds no material question of law or fact remains such that a factfinder is needed to

10   resolve whether Vacaville's collection, treatment and dissemination of potable water containing

11   detectable levels of hexavalent chromium renders its water supply subject to the statutory

12   definition of "solid waste."

13           Vacaville's summary judgment motion will be GRANTED, and, in turn, plaintiff's

14   summary judgment motion DENIED.

15           D.      Motions to Strike and to Exclude

16            River Watch also moves to exclude portions of Vacaville's expert witness reports,

17   ECF No. 50, and to strike the declaration of Adam Love in support of Vacaville's motion for

18   summary judgment, ECF No. 60.  Vacaville separately moves to strike River Watch's deposition

19   errata as to Dr. Russell.  ECF No. 57.  Because the court relied on neither Vacaville's expert

20   reports, the declaration of Adam Love nor the proposed corrections to the deposition of

21   Dr. Russell in resolving the summary judgment motions above, it need not resolve either of these

22   motions here.  Accordingly, the motions are denied as MOOT.

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

1  IV.   <u>CONCLUSION</u>

2          Based on the foregoing discussion, defendant's motion for summary judgment,

3  ECF No. 51, is GRANTED and plaintiff's motion for summary judgment, ECF No. 40, is

4  DENIED.  Plaintiff's motion to exclude, ECF No. 50, and motion to strike, ECF No. 60, as well

5  as defendant's motion to strike, ECF No. 57, all are DENIED as moot.  The Clerk of Court is

6  directed to enter judgment in defendant's favor and close this case.

7          IT IS SO ORDERED.

8  DATED:  July 19, 2020.

9

10                          CHIEF UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28