UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUL 25 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

---

CALIFORNIA RIVER WATCH,

        Plaintiff - Appellant,

  v.

CITY OF VACAVILLE,

        Defendant - Appellee.

No. 20-16605

D.C. No. 2:17-cv-00524-KJM-KJN
U.S. District Court for Eastern
California, Sacramento

**MANDATE**

---

The judgment of this Court, entered July 01, 2022, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

        FOR THE COURT:

        MOLLY C. DWYER
        CLERK OF COURT

        By: Jessica Flores
        Deputy Clerk
        Ninth Circuit Rule 27-7

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CALIFORNIA RIVER WATCH, *Plaintiff-Appellant*, v. CITY OF VACAVILLE, *Defendant-Appellee.* | No. 20-16605<br><br>D.C. No. 2:17-cv-00524-KJM-KJN<br><br>ORDER AND OPINION |

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, Chief District Judge, Presiding

Argued and Submitted June 14, 2021
San Francisco, California

Filed July 1, 2022

Before: A. Wallace Tashima and Patrick J. Bumatay,
Circuit Judges, and Douglas L. Rayes,[*] District Judge.

Order;
Opinion by Judge Bumatay;
Concurrence by Judge Tashima

---

[*] The Honorable Douglas L. Rayes, United States District Judge for
the District of Arizona, sitting by designation.

## SUMMARY[**]

---

### Environmental Law

The panel filed (1) an order withdrawing majority and dissenting opinions and replacing them with a superseding opinion and concurring opinion, denying as moot a petition for rehearing en banc, and denying a motion for permissive intervention; (2) a superseding opinion affirming the district court's grant of summary judgment for defendant City of Vacaville in a citizen suit brought under the Resource Conservation and Recovery Act by California River Watch; and (3) a separate opinion concurring only in the judgment.

River Watch claimed that the City's water wells were contaminated by a carcinogen called hexavalent chromium. That carcinogen, River Watch said, was in turn transported to the City's residents through its water-distribution system. River Watch alleged that the City thus was contributing to the transportation of a solid waste in violation of RCRA, under which one definition of "solid waste" is "discarded material." The district court granted summary judgment on the ground that River Watch had not demonstrated how the City's water-processing activities could qualify as discarding "solid waste" under RCRA.

The panel concluded that River Watch sufficiently raised before the district court, and therefore did not forfeit, the argument that the hexavalent chromium was "discarded material" that allegedly had migrated through groundwater

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

from the "Wickes site," where it had been dumped by operators of wood treatment facilities.

The panel held that to establish RCRA liability, a plaintiff must establish (1) that the defendant "ha[s] contributed to the past or [is] contributing to the present handling, treatment, transportation, or disposal" of certain material; (2) that this material constitutes "solid waste" under RCRA; and (3) that the solid waste "may present an imminent and substantial endangerment to health or the environment."

The panel held that River Watch created a triable issue on whether the hexavalent chromium was "discarded material" and thus met RCRA's definition of "solid waste." The panel further held, however, that the City did not have the necessary connection to the waste disposal process to be held liable for "transportation." The panel held that, based on the statutory text of RCRA, "transportation" means movement in direct connection with the waste disposal process, such as shipping waste to hazardous waste treatment, storage, or disposal facilities, rather than mere conveyance of hazardous waste. Under River Watch's theory of liability, hexavalent chromium seeped through groundwater into the City's wells, and the City incidentally carried the waste through its pipes when it pumped water to its residents. The panel concluded that, under this theory, the City could not be held liable for "transportation."

Concurring only in the judgment, Judge Tashima wrote that he found the majority's reasoning unpersuasive and did not join it its analysis, but he reached the same result under a different line of reasoning, concluding that under *Hinds Investments, L.P. v. Angioli*, 654 F.3d 846 (9th Cir. 2011), the City was not liable under RCRA because it was neither

actively involved in nor exercised control over the waste disposal process.

## COUNSEL

Jack Silver (argued), Law Office of Jack Silver, Sebastpolo, California; David J. Weinsoff, Law Office of David J. Weinsoff, Fairfax, California; for Plaintiff-Appellant.

Gregory J. Newmark (argued) and Shiraz D. Tangri, Meyers Nave, Los Angeles, California, for Defendant-Appellee.

Mitchell C. Tilner and David M. Axelrad, Horvitz & Levy LLP, Burbank, California, for Amici Curiae Association of California Water Agencies, Western Urban Water Coalition, Association of Metropolitan Water Agencies, and American Water Works Association.

Victor M. Sher, Matthew K. Edling, and Yumehiko Hoshijima, Sher Edling LLP, San Francisco, California, for Amici Curiae National League of Cities and League of California Cities.

Jared E. Knicley, Natural Resources Defense Council, Washington, D.C.; Francis W. Sturges Jr., Natural Resources Defense Council, Chicago, Illinois; for Amicus Curiae Natural Resources Defense Council.

## ORDER

The majority and dissenting opinions filed on September 29, 2021, and published at 14 F.4th 1076, are withdrawn and replaced by the superseding opinion and concurring opinion filed concurrently with this order. The petition for rehearing en banc is denied as moot. Further petitions for rehearing may be filed within the time periods specified by the applicable rules. The pending motion for permissive intervention is denied [Dkt. No. 60].

## OPINION

BUMATAY, Circuit Judge:

The Resource Conservation and Recovery Act ("RCRA") seeks to minimize the dangers accompanying hazardous waste disposal. 42 U.S.C. § 6902(b).[1] To that end, the Act enables any person to sue any entity that is contributing to the transportation of dangerous solid waste. § 6972(a). In this case, a nonprofit organization called California River Watch claims that the City of Vacaville, California is violating the Act. River Watch claims that the City's water wells are contaminated by a carcinogen called hexavalent chromium. That carcinogen, River Watch says, is in turn transported to the City's residents through its water-distribution system. We must decide whether the City can be held liable under RCRA.

---

[1] Unless otherwise noted, all section (§) citations refer to Title 42 of the U.S. Code.

## I.

Hexavalent chromium is a human carcinogen.  When inhaled, consumed orally, or exposed to the skin, it is known to cause significant health risks, including cancer.

From about 1972 to 1982, companies like Pacific Wood Preserving and Wickes Forest Industries, Inc., operated wood treatment facilities in Elmira, California.  It was common for waste products from these companies to contain hexavalent chromium.  In particular, Wickes is known to have dumped a massive amount of hexavalent chromium in the ground near Elmira ("the Wickes site").[2]

As a result, the Wickes site was identified and listed as a federal hazardous waste site in 1980.  Several years later, the site was found to have contaminated three drinking-water wells nearby, including one at Elmira Elementary School.  Samples of groundwater taken from the site at the time revealed hexavalent chromium levels thousands of times greater than California's stated public health goals.

River Watch contends that this hexavalent chromium has since migrated through groundwater from the Wickes site to the Elmira Well Field, where the City draws much of its water.  In fact, eight of the City's eleven wells are in the field.  According to River Watch's expert, testing of potable water from the City's well-heads and resident taps reveals elevated concentrations of hexavalent chromium.  River Watch's expert believes that hexavalent chromium moves from the Wickes site to the Elmira Well Field and ultimately

---

[2] We take these background facts from River Watch's expert witness report, which the district court assumed to be true for purposes of the summary judgment motion.

into the homes of residents through the City's water-distribution system.  Thus, River Watch charges that the City is "transporting and discharging water containing high amounts of hexavalent chromium" in a manner dangerous to residents.

River Watch sued the City under RCRA, alleging that the City is "contributing to" the "transportation" of hexavalent chromium, a "solid . . . waste which may present an imminent and substantial endangerment to health or the environment."  § 6972(a)(1)(B).  Because one definition of "solid waste" is "discarded material," the central dispute here is whether the hexavalent chromium was discarded. § 6903(27).  To rebut River Watch's claim, the City offered evidence that the hexavalent chromium is naturally occurring and thus not a "discarded material."

The parties then cross-moved for summary judgment. The district court granted the City's motion and denied River Watch's motion because, as it explained, River Watch hadn't demonstrated how the City's water-processing activities could qualify as discarding "solid waste" under RCRA. Thus, the district court explained, RCRA's "fundamental requirement that the contaminant be 'discarded'" was not satisfied.  River Watch appealed.

We review orders granting summary judgment de novo. *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 447 (9th Cir. 2018).  We review the evidence as a whole and in the light most favorable to River Watch as the party opposing summary judgment.  *Id.* at 448.  And we may affirm the district court on any ground supported by the record.  *Kohler v. Bed Bath & Beyond of California, LLC*, 780 F.3d 1260, 1263 (9th Cir. 2015).

## II.

River Watch's argument on appeal is simple: because the hexavalent chromium originates from the Wickes site, it is "discarded material" under RCRA, and thus the City is liable for its transportation through its water-distribution system. Before turning to the merits, we consider whether River Watch has forfeited this argument.

## A.

According to the City, River Watch has forfeited its argument that the hexavalent chromium is "discarded material" from the Wickes site because it did not raise that theory in the district court.  It's true that River Watch told the district court multiple times that the precise genesis of the hexavalent chromium was "irrelevant."  And we agree that, if River Watch never presented the theory that the hexavalent chromium originated from the Wickes site before the district court, it could not now claim that the substance was "discarded material" under its interpretation of RCRA. *See Baccei v. United States*, 632 F.3d 1140, 1149 (9th Cir. 2011) (holding that we do not generally consider arguments raised for the first time on appeal).

But that's not the full story.  Throughout its summary judgment papers, River Watch consistently maintained that the origin of the hexavalent chromium in the City's water was "anthropogenic," i.e., caused by humans.  To be sure, River Watch did suggest that the hexavalent chromium could have come from multiple industrial or agricultural sources. But it also specifically highlighted the Wickes site as one of those sources.  In fact, River Watch expressly contended that the Wickes facility was "likely" the source of the hexavalent chromium in the City's wells.  Mimicking its argument on appeal, River Watch argued that "if *any* of the hexavalent

chromium in the City's wells is from an industrial source, th[e]n that hexavalent chromium is a solid waste."  In the next breath, River Watch suggested that the Wickes site was the source of the hexavalent chromium—especially by showing a decline in hexavalent chromium levels at the Elmira Well Field after the Wickes facility closed down.

So, before the district court, River Watch claimed that the hexavalent chromium was anthropogenic but that the substance's exact origin was irrelevant.  On appeal, River Watch now focuses on the Wickes site as the source of the chemical.  That's ok, because it has always maintained that Wickes was the likely cause of the hexavalent chromium in the City's water.  Appealing only one of several alternative theories argued to the district court is hardly an uncommon practice and is not a basis to find forfeiture.  *See Hansen v. Morgan*, 582 F.2d 1214, 1217 (9th Cir. 1978) (relying on an alternative theory on appeal when the "essence" of the argument was "directed at the same concerns" as the theory argued below).  River Watch has therefore not forfeited this argument.  We proceed to the merits.

**B.**

RCRA creates a private cause of action for citizens to seek relief against present or future risks of "imminent harms" to health or the environment.  *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1089 (9th Cir. 2017) (simplified).   Under what we've called RCRA's "endangerment provision," *id.*, "any person" may file suit against:

> [A]ny person, including the United States and any other governmental instrumentality or agency, . . . and including any past or present generator, past or present transporter, or past

>or present owner or operator of a treatment,
>storage, or disposal facility, who has
>contributed or who is contributing to the past
>or present handling, storage, treatment,
>transportation, or disposal of any solid or
>hazardous waste which may present an
>imminent and substantial endangerment to
>health or the environment[.]

§ 6972(a)(1)(B).   We've described these citizen suits as "expansive." *Ecological Rts. Found.*, 874 F.3d at 1089.

From this text, we've gleaned three elements to establish RCRA liability: (1) that the defendant "ha[s] contributed to the past or [is] contributing to the present handling, treatment, transportation, or disposal" of certain material; (2) that this material constitutes "solid waste" under RCRA; and (3) that the solid waste "may present an imminent and substantial endangerment to health or the environment." *Ctr. for Cmty. Action & Env't Just. v. BNSF R. Co.*, 764 F.3d 1019, 1023 (9th Cir. 2014).

### 1.

We first consider whether River Watch has a cognizable legal theory that the hexavalent chromium in the City's water is "solid waste."   RCRA defines "solid waste" as:

>[A]ny garbage, refuse, sludge from a waste
>treatment plant, water supply treatment plant,
>or air pollution control facility and other
>discarded material, including solid, liquid,
>semisolid, or contained gaseous material
>resulting from industrial, commercial,
>mining, and agricultural operations[.]

§ 6903(27).   River Watch asserts that the hexavalent chromium is "solid waste" under the "discarded material . . . resulting from industrial, commercial, and agricultural operations" definition.  *Id.*

We have discussed the meaning of "discarded material" before.   We said "discard" means to "cast aside; reject; abandon; give up."  *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 515 (9th Cir. 2013) (simplified) ("*Ecological Rts. Found. I*").   And therefore, we explained, whether a product has "served its intended purpose and is no longer wanted by the consumer" is a "key" consideration in determining whether a substance constitutes solid waste.  *Id.* (simplified); *see also No Spray Coal., Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001) ("[M]aterial is not discarded until after it has served its intended purpose.").

In *Ecological Rights Foundation I*, an environmental organization complained of the discharge of a wood preservative used to treat utility poles.  713 F.3d at 515.  The organization alleged that the preservative contained a biocide that leaked from the poles into the environment.  *Id.* We held that the preservative was not "discarded material" because it was "being put to its intended use as a general biocide" on utility poles and only escaped into the environment through normal wear and tear.  *Id.* at 515–16. Thus, the preservative was neither "manufacturing waste by-product" nor material that the consumer "no longer want[ed] and ha[d] disposed of or thrown away."  *Id.* at 515.  Instead, the wood preservative had been "washed or blown away . . . by natural means, as an expected consequence of the preservative's intended use, [and thus] ha[d] not been 'discarded.'"  *Id.* at 516.

This case presents the converse.   Through its expert, River Watch established that hexavalent chromium was

widely used in commercial wood preservation near the Elmira Well Field. And it was common practice at facilities like the Wickes site to drip dry wood treated with hexavalent chromium—allowing it to trickle directly into the soil. The expert also claimed that Wickes dumped a "massive amount" of hexavalent-chromium waste into the ground at the location.

If River Watch's expert is credited, the hexavalent chromium meets RCRA's definition of "solid waste." When the hexavalent chromium was discharged into the environment after the wood treatment process, it was not serving its intended use as a preservative, and it did not result from natural wear and tear. Instead, the hexavalent chromium was leftover waste, abandoned and cast aside by the facilities' operators. This means that under RCRA's plain meaning, River Watch created a triable issue on whether the hexavalent chromium is "discarded material."

### 2.

The next question, however, is whether the City is "contributing to the past or present . . . transportation" of hexavalent chromium. § 6972(a)(1)(B). River Watch argues that the City is liable because it has physically moved the waste by pumping it through its water-supply system. The City counters that "transportation" requires a direct connection to the waste disposal process—not coincidental movement of the waste through the City's water supply.

We begin, as always, with the ordinary meaning of the statute. "Transportation" is literally defined as the "action or process of transporting; conveyance (of things or persons) from one place to another." *Transportation*, Oxford English Dictionary (2d ed. 1989); *see also Transport*, American Heritage Dictionary (3d ed. 1992) ("To carry from one place

to another."); *Transport*, Webster's New Collegiate Dictionary (1977) ("[T]o transfer or convey from one place to another.").   So at first blush, the meaning of "transportation" seems to include any party who moves the waste.  But that's not the end of the story.

Sometimes looking at dictionary definitions in isolation can lead us astray.  *See Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010).  A legislative term's meaning may also be uncovered "by the specific context in which that language is used, and the broader context of the statute as a whole." *Yates v. United States*, 574 U.S. 528, 537 (2015) (simplified).  To be clear, we don't look beyond a term's ordinary meaning lightly; we may do so only where there is a "sound reason in the statutory text or context." *FCC v. AT&T, Inc.*, 562 U.S. 397, 407 (2011).  In this case, by looking to statutory context, we see that RCRA repeatedly uses "transportation" to describe movement in direct connection with the waste disposal process.

RCRA's context makes clear that mere conveyance of hazardous waste cannot constitute "transportation" under the endangerment provision.  For instance, RCRA authorizes the establishment of "[s]tandards applicable to *transporters* of hazardous waste." (emphasis added).  § 6923(a).  At a minimum, these standards must include recordkeeping requirements*,* labeling requirements, compliance with a shipping manifest system, and restrictions that limit the locations where waste can be transported.  § 6923(a)(1)–(4). It thus follows that "transporters" are not those who *happen* to move hazardous waste under any circumstance, but only to those "shipper[s]" of the waste to "hazardous waste treatment, storage, or disposal facilities."  § 6923(a)(4).

Congress used this more nuanced meaning of transportation throughout the statute.  For example, RCRA's

permitting provision requires a permit for owners and operators of facilities for the treatment, storage, or disposal of hazardous waste.  § 6925.  Applicants for the permits must provide certain information about the "composition, quantities and concentrations" of waste to be "transported" and the "site at which such . . . waste . . . be disposed of, treated, transported to, or stored."  § 6925(b)(1)–(2).  At the same time, RCRA's inspection provision allows authorized agents to (1) obtain relevant records from "any person who . . . transports" hazardous waste, (2) inspect "any establishment" where wasted is "transported from," and (3) collect samples from their transportation containers.  § 6927(a).  These meticulous permitting and inspection requirements do not purport to apply to any party that indirectly moves waste.  After all, this regulatory regime would be unworkable if it applied to waste that seeps through groundwater and inadvertently makes its way into a water supply.  Instead, transportation refers to the specific task of moving waste in connection with the waste disposal process.

RCRA's criminal provisions reinforce the position that "transportation" refers to the movement of waste directly connected to the waste disposal process.  RCRA's criminal provisions crack down on a variety of conduct that takes place within the waste disposal process.  § 6928(d).  First, RCRA makes it unlawful for any person to "knowingly transport[]" hazardous waste "to a facility which does not have a permit."  § 6928(d)(1).  RCRA also makes it illegal for parties who "knowingly . . . transport[]" hazardous waste to destroy "any record, application, manifest, report or other document" or to "knowingly transport[] without a manifest."  § 6928(d)(4)–(5).  A "manifest" is "the form used for identifying the . . . destination of hazardous waste during its *transportation* from the point of generation to the point of disposal, treatment or storage."  § 6903(12) (emphasis

added).  In combination, these provisions make clear that transportation does not involve the incidental movement of hazardous waste, but refers to the active movement of waste as part of the waste disposal process.  Otherwise, why refer to manifests, permits, and the like?

RCRA's structure and applicable regulations also emphasize this direct connection between "transportation" and the waste disposal process.  The regulations begin by defining "transportation" as the "movement of hazardous waste by air, rail, highway, or water."  40 C.F.R. § 260.10.  But under multiple RCRA provisions and implementing regulations, "transporters" of hazardous waste must follow a series of calibrated steps—all designed to move waste from its source to a permitted facility for treatment, storage, or disposal.  *See* 40 C.F.R. § 262.20 (describing the manifest requirements in moving waste from its source to a permitted facility).  To start, a waste "transporter" must register with the EPA.  *Id.* § 263.11.   Then the "transporter" must coordinate with a waste generator to arrange a pickup date and log the information into a shipping manifest system.  *Id.* §§ 262.23(a)(2), 263.20.  And the rules specifically require waste "transporter[s]" to provide the generator with a signature certifying the date of acceptance.  *Id.* § 263.20(a)(2).  Then, on the relevant date, the "transporter" must pick up the waste at the designated site and deliver it to a permitted facility.  *Id.* § 263.21.  So, as the City accurately puts it, RCRA establishes a "cradle to grave" framework for the transport and disposal of hazardous waste.  And as part of this framework, waste "transporters" play a specific role in moving waste from its origin to its disposal facility.

And this specific meaning of "transportation" remains true in the solid waste context.  RCRA uses "transportation" of solid waste to require a connection to the waste disposal

process. First, RCRA's statutory purpose expressly connects solid waste transportation with waste disposal systems. *See* 42 U.S.C. § 6902(a)(8) (discussing the objective of establishing "guidelines for solid waste collection, transport, . . . and disposal practices and systems"). RCRA also provides nearly the exact same definition for "hazardous waste management" and "solid waste management." *Compare id.* § 6903(7), *with id.* § 6903(28). These provisions contemplate the "control" and "systemic administration" of "transportation" and "disposal" processes for hazardous and solid waste. *See id.* §§ 6903(7), 6903(28). RCRA also directly connects "transportation" and disposal in describing the components of a solid waste management facility. *Id.* § 6903(29)(C) (defining it as "any facility for the . . . transportation . . . or disposal, of solid wastes, including hazardous wastes"). The better reading of RCRA is that waste transportation—whether of hazardous or solid waste—must be connected to the waste disposal process.

Most significantly, the endangerment provision itself strongly implies a more targeted meaning of "transportation." Again, the endangerment provision applies to "[a]ny person, including . . . [any] past or present *transporter* . . . who has contributed or who is contributing to the past or present . . . *transportation* . . . of any solid or hazardous waste." § 6972(a)(1)(B) (emphasis added). So Congress used "transportation" after reference to a "transporter" of waste. And as we have just discussed, the term "transporter" carries a specific connection to the waste disposal process throughout RCRA. In general, "a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). Here, the proximity between "transporter" and "transportation" suggests that the terms share similar

meanings.   In other words, Congress's reference to a "transporter" of waste narrows the context of what it means to "transport[]" waste.

Indeed, in the endangerment provision, Congress established liability for those involved in the full range of the waste disposal process—"generator[s]," "transporter[s]," and "owner[s] or operator[s] of a treatment, storage, or disposal facility."  § 6972(a)(1)(B).  Thus, the endangerment provision creates incentives for participants in the waste disposal process to protect health and the environment—but it's not a catchall environmental protection statute.  We've already said this in the context of "disposal" liability under the endangerment provision.   *See Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 851 (9th Cir. 2011).  There, we held that "disposal" in the endangerment provision "requires that a defendant be actively involved in or have some degree of control over the waste disposal process to be liable under RCRA."  *Id.*  So, like *Hinds*, we conclude that the best reading of RCRA is that the "transportation" at issue must also be directly connected to the waste disposal process— such as shipping waste to hazardous waste treatment, storage, or disposal facilities.[3]

---

[3] We acknowledge our previous opinion held that the ordinary meaning of "transportation" did not require a direct connection to the waste disposal process.  *California River Watch v. City of Vacaville*, 14 F.4th 1076, 1081–82 (9th Cir. 2021).  Yet, as Justice Robert Jackson explained long ago, there is "no reason why [we] should be consciously wrong today, because [we were] unconsciously wrong yesterday."  *Massachusetts v. United States*, 333 U.S. 611, 639–40 (1948) (Jackson, J., dissenting).  The City's further briefing on the context and structure of RCRA's provisions has persuaded us that we must look beyond dictionary definitions to determine the meaning of "transportation" in the endangerment provision.  By doing so, we better interpret RCRA as "a

18   CALIFORNIA RIVER WATCH V. CITY OF VACAVILLE

Turning to the facts here, the City does not move hexavalent chromium in direct connection with its waste disposal process.  Under River Watch's theory of liability, hexavalent chromium seeps through groundwater into the City's wells and the City incidentally carries the waste through its pipes when it pumps water to its residents.  River Watch doesn't allege that the City transports the hexavalent chromium as part of the City's waste disposal process. Indeed, no evidence suggests that the City is a "transporter" of waste under RCRA's definitions.  As a result, we conclude that the City does not have the necessary connection to the waste disposal process to be held liable for "transportation" under § 6972(a)(1)(B).

**3.**

Our concurring colleague agrees that transporter liability under the endangerment provision must be connected to the waste disposal process, but reaches that conclusion based on precedent and an application of the absurdity canon rather than the statutory text.  Concurrence at 26–28 (citing *Hinds*, 654 F.3d at 852).  We disagree with this approach for multiple reasons.

First, *Hinds* doesn't control this case.  *Hinds* addresses the meaning of "contribution" to the "disposal" of waste. *Hinds*, 654 F.3d at 850.  Interpreting the statutory text, we held that "'[c]ontribution' requires a more active role with a more direct connection to the waste," such as "[h]andling the

---

harmonious whole" and avoid giving inconsistent meaning to the term "transportation."  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  Because it is "never too late to surrender former views to a better considered position," *South Dakota v. Wayfair*, 138 S. Ct. 2080, 2100 (2018) (Thomas, J., concurring), we reverse our prior holding in favor of the better reading of RCRA.

CALIFORNIA RIVER WATCH v. CITY OF VACAVILLE   19

waste, storing it, treating it, transporting it, or disposing of it." *Id.* at 851. Thus, the *Hinds* plaintiffs could not hold the manufacturers of dry-cleaning equipment liable for waste that was generated by the machine and then improperly disposed by others. *Id.* at 852. Our case does not involve "disposal" liability—River Watch alleges that the City is a past or present "transporter" of the waste. While instructive here, *Hinds* does not govern.

Second, there is no reason to apply the absurdity canon. In addition to relying on *Hinds*, the concurrence reaches its interpretation of RCRA based on what "makes eminent sense," what won't "produce nonsensical results," and what won't punish "innocent parties." Concurrence at 26–28. "It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). But this interpretative canon will "override the literal terms of a statute only under rare and exceptional circumstances." *Crooks v. Harrelson*, 282 U.S. 55, 60 (1930). And because the absurdity canon is used to justify a departure from the literal terms of a statute, we first must engage with and interpret RCRA's text—a crucial step the concurrence skips because of its dispositive reliance on *Hinds*. For reasons explained in this opinion, we conclude based on the RCRA's text that the "transportation" at issue in the endangerment provision must be directly connected to the waste disposal process, which is an interpretation that does not implicate the absurdity canon.

The concurrence disagrees with our textual analysis, particularly reading "transportation" in the context of RCRA as a whole. But the concurrence acknowledges that "transportation" has a "specialized meaning" in some parts

of RCRA, yet curiously it doesn't say what it means in § 6972(a)(1)(B). Concurrence at 32. In other words, the concurrence does not provide its own view of what "transportation" actually means in the endangerment provision—let alone a meaning that contradicts our interpretation. To apply the absurdity canon without first interpreting the meaning of "transportation" puts the cart before the horse.

Lastly, the concurrence takes an unduly narrow view of when we look to statutory context and structure, suggesting we can't use context across subchapters. Concurrence at 30. But, as the Supreme Court has explained, "[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Congress chose to use "transportation," "transporter," and "transport" throughout RCRA, and "a word or phrase is presumed to bear the same meaning throughout a text" even "when different sections of an act or code are at issue." Antonin Scalia & Bryan A. Garner, Reading Law 156–57 (2012).

### III.

Because the City cannot be held liable under RCRA, we affirm the district court's grant of summary judgment for the City.

### AFFIRMED.

TASHIMA, Circuit Judge, concurring only in the judgment:

Defendant City of Vacaville (the "City") draws groundwater from wells and distributes it to City residents. Although the City's water complies with federal and state drinking water standards, the water contains hexavalent chromium, which Plaintiff California River Watch ("River Watch") contends is a danger to human health. River Watch does not assert that the City did anything to cause the contamination. On the contrary, River Watch concedes that the City is the victim here: the alleged source of the hexavalent chromium is a former wood treatment plant located a mile or more from the City's wells. Nevertheless, River Watch contends that, by drawing water from its wells, the City is "contributing to the . . . handling, storage, treatment, transportation, or disposal of . . . solid . . . waste," in violation of the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6972(a)(1)(B).

I reject River Watch's argument. In *Hinds Investments, L.P. v. Angioli*, 654 F.3d 846, 851 (9th Cir. 2011), we held that § 6972(a)(1)(B) "requires that a defendant be actively involved in or have some degree of control over the waste disposal process to be liable under RCRA." Here, it is conceded that the City had no involvement whatsoever in the waste disposal process. Accordingly, under *Hinds*, the City is not liable under the RCRA. Because the majority reaches that result, albeit under a line of reasoning with which I cannot agree, I concur only in the judgment.

## I.

The City supplies water to residential and commercial customers. This water comes from two sources: surface waters and wells. The City operates a total of eleven wells, including eight lying within the Elmira Well Field. The City

draws water from these wells, processes it, and delivers it to its water customers.

The City's water complies with all federal and state drinking water standards, including Safe Drinking Water Act standards promulgated by the U.S. Environmental Protection Agency ("EPA"). The EPA's maximum contaminant level for total chromium in drinking water is 0.1 milligram per liter or 100 parts per billion. California's maximum contaminant level for total chromium is 0.05 milligram per liter or 50 parts per billion. The City complies with both standards. The federal and California drinking water standards contain no separate standard for hexavalent chromium.

The City's drinking water contains hexavalent chromium. River Watch contends that the source of the hexavalent chromium in the City's drinking water is the Wickes site, a former wood treatment facility that, from 1972 to 1982, conducted lumber treatment operations using wood preservatives that contained arsenic, chromium, and copper. The Wickes site is located between 1.4 and 3.3 miles from the Elmira Well Field. River Watch asserts that hexavalent chromium from the Wickes site migrated via groundwater to the Elmira Well Field, where it contaminated the City's wells. The City disputes River Watch's contention that the Wickes site is the source of the hexavalent chromium found in the City's wells, but on summary judgment we view the evidence in the light most favorable to the nonmoving party. *Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009).

Although the City's water complies with federal and state drinking water standards, River Watch believes those standards are too lenient and that the City's water poses a danger to human health. River Watch, however, has not

challenged the EPA's standards through the normal course. The Safe Drinking Water Act requires the EPA to "review and revise, as appropriate, each national primary drinking water regulation" at least once every six years, 42 U.S.C. § 300g-1(b)(9), and, if the EPA fails to discharge this duty, "any person may commence a civil action . . . against the [EPA] Administrator," *id.* § 300j-8(a)(2).   Rather than pursuing relief under the Safe Drinking Water Act, River Watch commenced this action against the City under the RCRA, a statute focused not on drinking water standards, but on "the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996).  The district court granted summary judgment to the City, and River Watch appealed.  The majority affirms the district court.  For the reasons set forth below, I would affirm as well, albeit for different reasons.

## II.

The RCRA's citizen-suit provision authorizes a civil action against any person "who has contributed . . . to the . . . handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B).[1]  To establish a

---

[1] Under § 6972(a)(1)(B),

> any person may commence a civil action on his own behalf . . . (B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or

24   CALIFORNIA RIVER WATCH v. CITY OF VACAVILLE

violation under this provision, we have held that a plaintiff must prove three elements:

> (1) the defendant has been or is a generator or transporter of solid or hazardous waste, or is or has been an operator of a solid or hazardous waste treatment, storage or disposal facility; (2) the defendant has "contributed" or "is contributing to" the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and, (3) the solid or hazardous waste in question may present an imminent and substantial endangerment to health or the environment.

*Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 514 (9th Cir. 2013).[2]

---

> who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).  A related provision, § 6973(a), authorizes the EPA to bring similar suits.

[2] I have some doubts about the accuracy of the first element's narrow definition.  The statute authorizes suit against "any person, . . . *including* any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility." 42 U.S.C. § 6972(a)(1)(B) (emphasis added).  In interpreting statutes, we ordinarily presume that "[t]he verb *to include* introduces examples, not an exhaustive list."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012).  There is no need to revisit this question here, however.

In *Hinds*, we considered the second of these elements. The case involved groundwater contaminated by perchloroethylene ("PCE"), a hazardous substance used in dry cleaning.  654 F.3d at 849.  The defendants were the manufacturers of dry cleaning equipment. *Id.* at 848.  The plaintiffs argued that the defendants had contributed to the disposal of PCE, in violation of the RCRA, "by the design of machines that generated waste and by the instructions they gave on use of these machines." *Id.*  The plaintiffs alleged, for instance, that the defendants' design manuals "instructed users that they should dispose of contaminated waste water in drains or open sewers." *Id.* at 849.

We examined the statutory text, but recognized that the RCRA's text "does not itself define what acts of contribution are sufficient to trigger liability." *Id.* at 850.  We looked to the dictionary definition of the word "contribute" but refused "to give wide breadth to this definition." *Id.*  We said:

> We decline to give such an expansive reading to the term "contribute."  Instead, . . . we decide that the statutory language permitting suits against "any person . . . who has contributed or who is contributing" to the handling, storage, treatment, transportation or disposal of hazardous waste, § 6972(a)(1)(B), requires that a defendant be actively involved in or have some degree of control over the waste disposal process to be liable under the RCRA.

*Id.* at 851 (second alteration in original).  Applying this standard to the facts of the case, we held that the manufacturers were not liable under the RCRA for contributing to the disposal of PCE:

We hold that to state a claim predicated on RCRA liability for "contributing to" the disposal of hazardous waste, a plaintiff must allege that the defendant had a measure of control over the waste at the time of its disposal or was otherwise actively involved in the waste disposal process. Mere design of equipment that generated waste, which was then improperly discarded by others, is not sufficient.

*Id.* at 852.

*Hinds* controls here. Like the plaintiffs in *Hinds*, River Watch has not shown that the City "had a measure of control over the waste at the time of its disposal or was otherwise actively involved in the waste disposal process." *Id.* On the contrary, the City had nothing to do with the waste disposal process at issue here. That process involved a single step: the operators of the Wickes facility discarded hexavalent chromium on site. Subsequent events—the alleged migration of the contaminant to the Elmira Well Field, the contamination of the City's wells, and the City's drawing of groundwater from its wells—were not, under any conceivable theory, part of that process. Just as the defendants' actions in *Hinds* preceded the waste disposal process, here the City's actions postdated that process.

*Hinds*' reading of the statutory text—limiting liability to those involved in the waste disposal process—makes eminent sense. Indeed, any other reading of the RCRA would produce nonsensical results. If the City is transporting solid waste, then so too is the Vacaville homeowner watering plants with a garden hose or handing a glass of tap water to a friend. And so too is a motorist who

picks up a few grains of soil while driving on a dirt road near the Wickes site.  Under River Watch's reading of the statute, as the City explains, "an entire aquifer contaminated by a solid waste site becomes one gigantic mass of solid waste."[3] If the City is transporting solid waste, then so too is every homeowner, farmer, rancher, municipal water authority, or agricultural irrigation district drawing groundwater or water from a contaminated aquifer.

Nothing in the RCRA's legislative history or in the case law supports River Watch's unduly broad interpretation of the statute.  Looking to legislative history, there is no question that Congress, in adopting the RCRA, was concerned about the problem of solid waste contaminating groundwater.  *See* H.R. Rep. No. 94-1491, at 4, 18, 20, 73, 89 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6238, 6242, 6255–56, 6258, 6312, 6325; H.R. Rep. No. 98-198, at 20, 31, 63 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5576, 5578, 5589–90, 5622.  But Congress was focused on entities that *caused* contamination of groundwater, not the victims of such contamination.  *See id.*  River Watch's reliance on case law fares no better.  As the City points out, the authorities River Watch cites "were cases against the defendant entities that allegedly disposed of solid waste in the first instance." River Watch cites no case in which "innocent parties whose products or property were allegedly affected by the industrial defendants' waste disposal" were subject to RCRA liability.

---

[3] Although aquifers vary in size, some are enormous.  The Ogallala Aquifer, for example, is a vast, 174,000 square-mile groundwater reservoir that supplies almost one-third of America's agricultural groundwater and drinking water for more than 1.8 million people. https://www.livescience.com/39625-aquifers.html (last visited May 5, 2022).

Imposing RCRA liability on the basis argued for by River Watch would be unprecedented and unwarranted.

The majority's suggestion that I am relying on the absurdity doctrine, Maj. Op. at 19, is mistaken. My analysis is based on *Hinds*, which in turn is based on the plain meaning of the statutory text. *See Hinds*, 654 F.3d at 850–52. It is true that I point out that River Watch's alternative interpretation of the statute would produce nonsensical results. Supra, at 26. But this observation is simply an additional reason to *follow* the plain meaning of the statutory text as we interpreted it in *Hinds*. The absurdity doctrine applies when a court *departs* from the plain meaning of a statute. *See, e.g.*, *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004); *Taylor v. Dir., Off. of Workers Comp. Programs*, 201 F.3d 1234, 1241 (9th Cir. 2000). That doctrine, therefore, plays no part in my analysis.

The majority's conclusion that *Hinds* is not controlling here, Maj. Op. at 18, is also mistaken. The majority distinguishes *Hinds* on the ground that the plaintiffs in that case were seeking to hold the defendant manufacturers liable for contributing to the *disposal* of hazardous waste, whereas here River Watch is attempting to hold the City liable to contributing to the *transportation* of solid waste. *Hinds*, however, clearly applies to this case. This is apparent from the plain language of our decision in *Hinds*:

> [W]e decide that the statutory language permitting suits against "any person . . . who has contributed or who is contributing" to the handling, storage, treatment, *transportation* or disposal of hazardous waste, § 6972(a)(1)(B), requires that a defendant be actively involved in or have some degree of

> control over the waste disposal process to be
> liable under RCRA.

*Hinds*, 654 F.3d at 851 (emphasis added) (quoting 42 U.S.C. § 6972(a)(1)(B)); *id.* ("The statutory prohibition on 'contributing to' speaks in active terms about 'handling, storage, treatment, *transportation*, or disposal' of hazardous waste." (emphasis added)); *id.* ("'Contributing' requires a more active role with a more direct connection to the waste, such as by handling it, storing it, treating it, *transporting* it, or disposing of it." (emphasis added)).  It is also apparent from our mode of analysis.  Our holding was based on the meaning of the word "contribute," which modifies both "disposal" and "transportation."  *Id.* at 850–51.  Like *Hinds*, this case too is a "contribution" case.  Finally, the principle underlying *Hinds*—that RCRA liability must have some sensible outer limit—applies at least as strongly to those accused of transporting waste as it does to those accused of disposing of it.  *Hinds*, it bears emphasizing, is the law of this circuit.  In addition, it is grounded in the statutory text, places sensible limits on RCRA liability, is readily administrable, and reaches the correct result in this case.

This case is controlled by *Hinds'* holding that § 6972(a)(1)(B) "requires that a defendant be actively involved in or have some degree of control over the waste disposal process to be liable under RCRA."  654 F.3d at 851.  Here, the City had no involvement in or control over that process.  I would affirm summary judgment for the City on that ground.

## III.

The majority reaches the same result through other means.  Because I find the majority's reasoning

unpersuasive, I concur in the result but, respectfully, do not join in the majority's analysis.

The majority begins by searching the RCRA's statutory text (and regulations) to identify uses of the words "transporter" and "transportation." Maj. Op. at 12–13 (citing 42 U.S.C. §§ 6923, 6925, 6927, 6928, 40 C.F.R. §§ 260.10, 262.20, 262.23, 263.11, 263.20, 263.21). Next, the majority examines these uses, and draws from them the conclusion that, when the RCRA uses the word transportation, it uniformly does so to refer "to the specific task of moving waste in connection with the waste disposal process." Maj. Op. at 14. Finally, because RCRA uses this meaning of transportation "throughout the statute," Maj. Op. at 13, the majority concludes that we can confidently assign this same meaning to the use of the word transportation in § 6972(a)(1)(B).

The majority's analysis is flawed for several interrelated reasons. First, the majority has not shown that the word transportation (or its variants) carries the same meaning "throughout the statute," Maj. Op. at 13, or "throughout RCRA," Maj. Op. at 16. Although the majority looks to a number of uses of the word "transportation" in the statute and regulations, each of those uses pertains to a single portion of the statute (Subtitle C) and a particular subject (the regulation of hazardous waste). Maj. Op. at 13–16 (citing 42 U.S.C. §§ 6923, 6925, 6927, 6928, 40 C.F.R. §§ 260.10, 262.20, 262.23, 263.11, 263.20, 263.21). Notably, none of the majority's uses arise under Subtitle D (governing the regulation of solid waste) or Subtitle G (the home of § 6972). There is, in short, no evidence that the word transportation carries the same meaning throughout the statute.

This might not be a problem if Subtitle C and § 6972(a)(1)(B) used identical language: "The normal rule

of statutory construction assumes that 'identical words used in different parts of the same act are intended to have the same meaning.'" *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) (quoting *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87 (1934)).   Subtitle C and § 6972(a)(1)(B), however, do not use identical words. Whereas Subtitle C defines the term "transportation . . of *hazardous* waste," 40 C.F.R. § 260.10 (emphasis added), the citizen-suit provision uses the term "transportation . . . of any *solid or hazardous* waste."  42 U.S.C. § 6972(a)(1)(B) (emphasis added).   Because these terms are distinct, we may not presume that they carry the same meaning.[4]

There is reason to believe, moreover, that Subtitle C's definition of transportation of hazardous waste does *not* extend beyond Subtitle C.  For purposes of Subtitle C, the terms transportation of hazardous waste and transporter of hazardous waste are defined by 40 C.F.R. § 260.10: "[t]ransportation means the movement of hazardous waste by air, rail, highway, or water" and "[t]ransporter means a person engaged in the offsite transportation of hazardous waste by air, rail, highway, or water."   But this regulation also makes clear that these definitions apply solely to Subtitle C—governing the regulation of hazardous waste. *See id.* ("When used in parts 260 through 273 of this chapter, the following terms have the meanings given below . . . .").

It is no surprise that these definitions are limited to Subtitle C.   Subtitle C addresses a specific problem—the comprehensive regulation of transporters of *hazardous* waste.  *See* 42 U.S.C. § 6923; 40 C.F.R. §§ 263.10–.31.  That

---

[4] Both provisions use the word "transportation," but Subtitle C does not define the term transportation in isolation.   It defines the transportation *of hazardous waste*.  40 C.F.R. § 260.10.

context is wholly unrelated to the transportation of solid waste, which is not similarly regulated, and § 6972(a)(1)(B), which imposes civil liability on persons contributing to the transportation of *any* solid waste, not just hazardous waste.[5]

In sum, the majority is correct to note that, under Subtitle C, the words "transportation of hazardous waste" have a specialized meaning.   But the majority errs in presuming that that meaning applies to § 6972(a)(1)(B). First, the majority has not pointed to any examples in which the statute uses this specialized meaning outside of Subtitle C and the regulation of hazardous waste.   The majority's assertion that the statute employs that meaning "throughout RCRA," Maj. Op. at 16, is therefore mistaken.   Second, by § 260.10's express terms, Subtitle C's specialized definition of transportation applies only to Subtitle C, not to the statute more broadly.   40 C.F.R. § 260.10.   Third, Subtitle C and § 6972(a)(1)(B) use different language and serve different purposes.   There is no reason to extend a specialized definition applicable to the transportation of hazardous waste to a civil liability provision applicable to the transportation of solid waste generally.   In short, Subtitle C does not supply a RCRA-wide definition of "transportation."

Instead of looking to Subtitle C's specialized and context-specific definition of transportation, I would resolve this appeal under *Hinds*, 654 F.3d at 851.   Because the City is neither actively involved in nor exercises control over the waste disposal process, it is not liable under § 6972(a)(1)(B). Accordingly, I concur only in the judgment.

---

[5] As the majority notes, the RCRA's criminal provisions also are limited to *hazardous* wastes.  *See* Maj. Op. at 14–15.

Case 2:17-cv-00524-KJM-KJN    Document 98    Filed 07/26/22    Page 34 of 38



LIVE

Subscribe ▼

**TRENDING**    Pregnancy tips    Roe v. Wade    COVID-19    Fitness    Extraterrestrial life

Live Science is supported by its audience. When you purchase through links on our site, we may earn an affiliate commission. Here's why you can trust us

Home > References

# Aquifers: Underground Stores of Freshwater

By Becky Oskin published October 17, 2018



cited in California River Watch v. City of Vacaville
No. 20-16605 archived on June 27, 2022

Source: Environment Canada

Case 2:17-cv-00524-KJM-KJN Document 98 Filed 07/26/22 Page 35 of 38

(Image credit: Environment Canada / USGS)

Aquifers are underground layers of rock that are saturated with water that can be brought to the surface through natural springs or by pumping.

The groundwater contained in aquifers is one of the most important sources of water on Earth: About 30 percent of our liquid freshwater is groundwater, according to the National Oceanic and Atmospheric Administration (NOAA). The rest is found at the surface in streams, lakes, rivers and wetlands. Most of the world's freshwater — about 69 percent — is locked away in glaciers and ice caps. The U.S. Geological Survey website has a map of important aquifers in the contiguous United States.

Groundwater can be found in a range of different types of rock, but the most productive aquifers are found in porous, permeable rock such as sandstone, or the open cavities and caves of limestone aquifers. Groundwater moves more readily through these materials, which allows for faster pumping and other methods of extracting the water. Aquifers can also be found in regions where the rock is made of denser material — such as granite or basalt — if that rock has cracks and fractures.



cited in California River Watch v. City of Vacaville
No. 20-16605 archived on June 27, 2022

More Videos

Close

PLAY SOUND

00:35 / 00:59

"Aquifers come in many shapes and sizes, but they are really a contained, underground repository of water," said Steven Phillips, a hydrologist with the U.S. Geological Survey (USGS) in Sacramento, California.

Dense, impermeable material like clay or shale can act as an "aquitard," i.e., a layer of rock or other material that is almost impenetrable to water. Through groundwater might move through such material, it will do so very slowly (if at all). Faults or mountains can also block the movement of fresh groundwater, as can the ocean, Phillips said.

An aquitard can trap groundwater in an aquifer and create an artesian well. When groundwater flows beneath an aquitard from a higher elevation area to a lower elevation, such as from a mountain slope to a valley floor, the pressure on the groundwater can be enough to force the water out of any well that's drilled into that aquifer. Such wells are known as artesian wells, and the aquifers they tap into are called artesian aquifers or confined aquifers.

## How groundwater moves

When new surface water enters an aquifer, it "recharges" the groundwater supply. Recharge primarily happens near mountains, and groundwater usually flows downward from mountain slopes toward streams and rivers by the force of gravity,

Case 2:17-cv-00524-KJM-KJN    Document 98    Filed 07/26/22    Page 36 of 38

Phillips said. Depending on the density of the rock and soil through which groundwater moves, it can creep along as slowly as a few centimeters in a century, according to Environment Canada. In other areas, where the rock and soil are looser and more permeable, groundwater can move several feet in a day.

The water in an aquifer can be held beneath the Earth's surface for many centuries: Hydrologists estimate that the water in some aquifers is more than 10,000 years old (meaning that it fell to the Earth's surface as rain or snow roughly 6,000 years before Egypt's Great Pyramid of Giza was built). The oldest groundwater ever found was discovered 2 miles (2.4 km) deep in a Canadian mine and trapped there between 1.5 and 2.64 billion years ago.

But the deeper one digs for water, the saltier the liquid becomes, Phillips said. "Groundwater can be very, very deep, but eventually it's a brine," he said. "For freshwater, the depths are very limited."

Much of the drinking water on which society depends is contained in shallow aquifers. For example, the Ogallala Aquifer — a vast, 174,000 square-mile (450,000 square kilometers) groundwater reservoir — supplies almost one-third of America's agricultural groundwater, and more than 1.8 million people rely on the Ogallala Aquifer for their drinking water.

Similarly, Texas gets almost 60 percent of its water from groundwater; in Florida, groundwater supplies more than 90 percent of the state's freshwater. But these important sources of freshwater are increasingly endangered.



Agriculture and a growing human population place significant demands on dwindling aquifers. (Image credit: Shutterstock)

## Threats to aquifers

By 2010, about 30 percent of the Ogallala Aquifer's groundwater had been tapped, according to a 2013 study from Kansas State University. Some parts of the Ogallala Aquifer are now dry, and the water table has declined more than 300 feet in other areas. More than two-thirds of this Ogallala aquifer groundwater could be drained in the next several decades, the study found.

"The water levels have just been going down, down, down," Phillip said. "A lot of that system was recharged 10,000 years ago during the most recent glacial period, and what we're doing now is mining the water. We're taking out old water that isn't being replenished."

Case 2:17-cv-00524-KJM-KJN    Document 98    Filed 07/26/22    Page 37 of 38

The same problem is increasingly found throughout the world, especially in areas where a rapidly growing population is placing greater demand on limited aquifer resources — pumping can, in these places, exceed the aquifer's ability to recharge its groundwater supplies.

When pumping of groundwater results in a lowering of the water table, then the water table can drop so low that it's below the depth of a well. In those cases, the well "runs dry" and no water can be removed until the groundwater is recharged — which, in some cases, can take hundreds or thousands of years.

When the ground sinks because of groundwater pumping, it is called subsidence. In California's southern San Joaquin Valley, where farmers rely on wells for irrigation, the land surface settled 28 feet (8.5 meters) between the 1920s and the 1970s, according to NASA, which uses satellite data to track subsidence.

"Land subsidence is a threat to aquifers and also to infrastructure on the surface," Phillips said.

In addition to groundwater levels, the quality of water in an aquifer can be threatened by saltwater intrusion (a particular problem in coastal areas), biological contaminants such as manure or septic tank discharge, and industrial chemicals such as pesticides or petroleum products. And once an aquifer is contaminated, it's notoriously difficult to remediate.

**Additional resources:**

- The U.S. Water Monitor is a daily "water health" report that summarizes federal water information.
- The USGS provides information on water quality in U.S. aquifers.
- The USGS National Water Information System's interactive map of nationwide water data.

*This article was updated on Oct. 17, 2018 by Live Science Associate Editor, Tia Ghose.*

---

### Becky Oskin

Contributing Writer

Becky Oskin covers Earth science, climate change and space, as well as general science topics. Becky was a science reporter at Live Science and The Pasadena Star-News; she has freelanced for New Scientist and the American Institute of Physics. She earned a master's degree in geology from Caltech, a bachelor's degree from Washington State University, and a graduate certificate in science writing from the University of California, Santa Cruz.

---

**MORE ABOUT...**

**LATEST**

**Best science kits for kids: Fun experiments for children of all ages ▸**

**Explore the oceans with this VR headset kit for kids, currently over $50 off at Amazo... ▸**

**SEE MORE LATEST ▸**

cited in California River Watch v. City of Vacaville No. 20-16605 archived on June 27, 2022

Live Science is part of Future US Inc, an international media group and leading digital publisher. **Visit our corporate site**.

About Us                    Terms and conditions              Privacy policy                Cookies policy

Accessibility Statement      Topics                           Advertise with us             Web notifications

Careers                      Do not sell my info

© Future US, Inc. Full 7th Floor, 130 West 42nd Street, New York, NY 10036.

cited in California River Watch v. City of Vacaville
No. 20-16605 archived on June 27, 2022